UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH LAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:11CV1615 TIA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3)for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On July 10, 2009, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI").  (Tr. 139-53)  In her applications, Plaintiff alleged disability beginning June 5, 2009 due to cumulative trauma to upper extremities, lower back pain, chronic neck pain, pain in elbows and hands, bipolar disorder, and depression.  (Tr. 72, 139, 148)   Plaintiff's applications were denied on October 26, 2009, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 69-76, 83)  On May 26, 2010, Plaintiff appeared and testified at a hearing in person via video teleconference from Columbia, Missouri.  (Tr. 29-68)  In a decision dated July 13, 2010, the ALJ determined that Plaintiff had not been under a disability from June 5, 2009 through the date of the decision.  (Tr. 12-24)  The Appeals Council denied Plaintiff's Request

for Review on July 29, 2011.  (Tr. 1-3)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  The ALJ held the hearing in Houston, Texas, and Plaintiff testified via video conference from Columbia, Missouri.  In an opening statement, Plaintiff's attorney stated his belief that Plaintiff met listing 11.08 due to significant and persistent disorganization of motor function in two extremities which resulted in sustained disturbance of gross or dexterous movements.  Counsel noted significant nerve injury in both upper extremities.  (Tr. 31-33)

Upon questioning by the ALJ, Plaintiff testified that she was born on February 6, 1969 and received a GED after leaving school after the 9th grade.  She was unmarried and had no children under the age of 18.  Plaintiff was able to read but had difficulty writing because her fingers cramped up.  She had a drivers license and was able to drive for about 10 minutes before she experienced problems with her neck, elbows, and hands.  Plaintiff lived by herself in an apartment.  She weighed 190 pounds and measured 5 feet 7 inches.  In addition, Plaintiff stated that she had not worked since June 5, 2009.  (Tr. 33-35)

Plaintiff further testified that she had problems from fusion surgery in her neck and problems with her upper extremities.  She stated that she could sit for about 20 minutes and stand for 10 minutes before needing to lay down for 30 minutes to an hour.  The pain in her neck was so intense, it caused headaches.  In addition, because of problems with her elbows, Plaintiff could not do repetitive motions or lift over 5 pounds.  If she tried to pick up small items, her hands would cramp, causing her to drop the item.  To alleviate pain, Plaintiff used a heating pad, a TENS unit, and a

2

massager.  She also took Percocet, Skelaxin, Naprosyn, and Neurontin.  The medications caused drowsiness, dizziness, and lightheadedness.  On an average day, the pain in Plaintiff's neck was an 8 out of 10.  On a bad day, the pain was a 9 or 10.  She did not have good days when the pain was at a level less than 8.  Further, she testified that she had bad days three to four times a week.  Plaintiff saw her doctor, who prescribed medication for the pain.  (Tr. 35-39)

In addition, Plaintiff stated that the pain in her neck radiated down her arms and to her hands, causing her to have problems holding things.  Plaintiff was able to dress herself but had trouble with buttons.  She also had difficulty tying bows.  She did not use a computer and testified that she last used a computer when she was working in May 2006.  Plaintiff did not have a cell phone but was able to use her home phone.  She testified to experiencing difficulty picking up and holding small items like coins and paperclips, as well as dishes, glasses, and plates.  She used paper plates and soda cans. (Tr. 39-41)

Plaintiff further stated that she was depressed, and the depression was worsening.  She was unmotivated and had trouble concentrating.  Further, Plaintiff did not like to be around people because they irritated and upset her.  She also started crying, and had days when she could not get out of bed.  Plaintiff had been seeing a psychiatrist for a year and a half.  She first saw the doctor every three months.  Since her depression worsened, however, Plaintiff saw the doctor once a month. Plaintiff took Cymbalta, Abilify, Elavil, Prozac, and Lithium for her mental impairments.  Despite psychiatric treatment and medication, Plaintiff's depression has stayed the same.  Plaintiff also saw another doctor, Dr. Choudhary, for pain.  (Tr. 41-43)

During the night, Plaintiff slept about 7 restless hours.  She woke up around 7:00 a.m and lay in bed for another hour.  Plaintiff then washed her face, brushed her teeth, fixed something to eat,

took her medications, and lay down again for about an hour.  Plaintiff then used her TENS unit and cleaned the kitchen before laying down again.  Plaintiff's mom would come over to check on her and motivate her to get moving.  Plaintiff was able to do dishes, laundry, and household chores.  In addition, she went to the grocery store, but could only do light shopping.  Plaintiff used to enjoy reading.  One of her doctors recommended exercises to stretch and strengthen muscles, and she testified that she tried to do them.  Plaintiff believed she could lift 5 pounds and walk for 10 minutes before requiring a break.  (Tr. 43-46)

Plaintiff's attorney also questioned her regarding her pain.  She described the neck pain as tightness in the back and sharp, stabbing pain.  The stabbing pain was constant and was located near her surgery site.  The pain radiated down her arms and into her hands and also caused headaches. Plaintiff also experienced shooting and stabbing pains in her shoulders, arms, and hands.  She had trouble using her arms to reach in front while washing dishes repetitively.  Plaintiff stated that she had surgery on both elbows and a carpal tunnel release on the right hand.  Plaintiff could move her head up and down but had problems twisting her head from side to side.  Keeping her head in one position aggravated her condition.  For instance, if she looked down for 5 minutes, her neck would start hurting.  (Tr. 46-49)

Plaintiff also had headaches at least once a week, sometimes more.  The neck pain caused the headaches.  Plaintiff opined that her ability to do things was much slower than before.  She estimated she could now work at half the speed.  In addition, she did not want to be around people because she became irritated with them.  (Tr. 49-50)

A vocational expert ("VE"), Karen E. Nielsen, Ph.D., also testified at the hearing.  The VE classified Plaintiff's past work as a customer service clerk at a dental insurance company as sedentary

4

and semi-skilled.  The ALJ then asked the VE to assume an individual of the same age, education, and work experience of Plaintiff.  The individual could lift 25 pounds frequently and 50 pounds occasionally; stand and walk six hours; sit for six hours; occasionally work around ropes, ladders, or scaffolds; and avoid concentrated exposure to cold and vibration.  Given this hypothetical, the person could perform Plaintiff's past work.  (Tr. 50-52)

The ALJ then changed the hypothetical to an individual who could lift 10 pounds frequently and 20 pounds occasionally; stand and walk six hours; sit for six hours; frequently push and pull with the bilateral upper extremities; occasionally climb; occasionally work around ropes, ladders, or scaffolds; occasionally reach overhead with bilateral upper extremities; and avoid concentrated exposure to cold and vibration.  Given this scenario, such person could also perform Plaintiff's past relevant work.  If the ALJ added that the person could understand, remember, and carry out only simple instructions; use judgment and respond appropriately to supervision and co-workers in the usual work situations; and deal with changes in a routine work setting, the individual could not perform Plaintiff's past work.  However, such person could work as an office helper, office cleaner, and mail clerk.  These jobs were light, unskilled, and existed in significant numbers in the national and state economies.  (Tr. 52-53)

However, if the individual experienced frequent headaches as described by Dr. Choudhary, one to two per week lasting most of the day, the person could not perform Plaintiff's past work.  Likewise, if the person had limitations to frequent fingering, she could perform past work.  However, if she suffered pain and had to lay down for 3 to 4 hours, then the individual could not work.  (Tr. 54)

5

Plaintiff's attorney also questioned the VE regarding Plaintiff's past relevant work.  The VE stated that Plaintiff's job as a customer service clerk required frequent reaching and handling.  With regard to two of the jobs the VE listed – office helper and mail clerk – these jobs required the use of arms but not reaching overhead.  However, office cleaner required frequent reaching.  Further, if the VE reconsidered hypothetical one with the added restrictions of limited concentration and focus due to pain, side effects of medication, and depression and anxiety requiring redirection by a supervisor several times a day, the individual could not perform Plaintiff's past work.  If her persistence or pace was only 2/3 of the pace of an unskilled worker, the person could not perform any of the jobs the VE listed.  Further, if the individual possessed the limitations set forth in Dr. Choudhary's medical source statement, mental, which set forth moderate limitations, she could not perform Plaintiff's past work but would be able to perform the full range of unskilled work.  However, if the individual missed 30% of time, she could not perform any work.  (Tr. 55-61, 66-67)

Finally, Plaintiff's attorney objected to the reliability of the VE's testimony and objected to the number of jobs, arguing that the VE did not cite jobs existing in significant numbers.  The ALJ overruled the objections.  (Tr. 62-68)

In a Disability Report – Adult, Plaintiff reported that she had trouble sitting or standing.  She experienced pain with any repetitive activity using her hands.  When her pain flared up, she was down for days, and she felt down and unhappy all the time.  Plaintiff also reported crying a lot and feeling useless.  Plaintiff stated that she stopped working on May 15, 2006 and quit because of pain.  (Tr. 166-67)

In a Function Report – Adult dated July 27, 2009, Plaintiff stated that a typical day consisted of preparing meals, taking medications, resting, using the TENS unit for 30 minutes at a time,

6

cleaning the house, and watching TV.  She had problems sleeping due to pain.  She had no problems with personal care, although she was limited in caring for her hair due to pain in elbows and cramping in fingers.  Plaintiff went outside several times a week.  She was able to drive but usually asked her daughter or mother to drive because of pain in upper extremities.  Plaintiff shopped for groceries or household items once or twice a week.  She spent about 30 minutes at a time but took breaks. Plaintiff was able to take care of finances; however, she had limited writing due to increased pain and cramping in fingers.  She enjoyed reading and watching TV, but she needed to lay down and relax about every 15 minutes.  Socially, Plaintiff talked on the phone daily a few minutes at a time and did light shopping once a week.  Plaintiff did not require someone to accompany her when shopping.  She socialized more in the past, but depression decreased her social activities.  In addition, she no longer attended church due to pain from sitting.  (Tr. 177-82)

Plaintiff further reported that her condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, concentrate, and use hands.  She specified that she could lift no more than 5 pounds and stand for about 10 to 15 minutes before needing to rest.  Increased pain limited her ability to squat and bend.  In addition, she could not reach repetitively due to elbow pain. Sitting was limited to 15 minutes, and she experienced increased pain in her neck and lower back when stair climbing.  When she used her hands repetitively, they would cramp.  Plaintiff could follow written and spoken instructions and get along with authority figures.  However, pain interrupted her attention.  She was unable to handle stress, which caused more pain and fatigue.  Changes in routine caused upset and disturbance.  Plaintiff further reported that she used a prescribed neck brace and wrist brace when her pain flared up.  (Tr. 182-84)

7

Plaintiff's daughter, Ashley Jackson, also completed a Function Report Adult – Third Party on August 2, 2009. She stated that Plaintiff's day consisted of getting up, making breakfast, eating, laying down, doing dishes, laying down, cleaning house, laying down, using stimulator, making dinner, laying down, cleaning kitchen, using stimulator, laying down, and going to bed. Plaintiff used to be able to work, socialize, and walk for long periods. Ms. Jackson reported that Plaintiff made sandwiches, easy food, and microwave meals daily. Plaintiff could also do laundry and light house cleaning, as well as shop for household items and groceries. Ms. Jackson's report essentially mirrored Plaintiff's report. (Tr. 188-95)

### III.  Medical Evidence

On July 31, 2007, Plaintiff underwent a left cubital tunnel release with partial submuscular anterior transposition and Z-plasty lengthening of the forearm flexor fascia. (Tr. 361) On June 3, 2008, Plaintiff saw Dr. Amtul Sami, M.D., at the Pain Clinic Department at Ellis Fischel Cancer Center. She reported pain in her neck, elbows, and hands. She further reported that her left elbow nerve release had helped, but the symptoms came back. She rated her pain as an eight out of ten, and she also experienced numbness and weakness in her elbows, arms, and fingers. While sitting, walking, standing, and bending aggravated this pain, lying down and changing positions decreased her pain. Review of systems was positive for headache and neck pain. Physical examination of the neck revealed an anterior fusion scar at C5-C7, which was well healed. In addition, Dr. Sami noted a rigid and long surgical scar in the cervical area, which was well healed. Plaintiff had a palpable buffalo hump in the neck where the neck and shoulders were mildly tender. Palpation of the occipital ridge showed positive tenderness in the right occipital area. Dr. Sami prescribed

8

medication and advised Plaintiff to return to the pain clinic for a right occipital nerve block.  (Tr. 206-08)

Plaintiff returned to Dr. Sami through September 2008.  She received occipital nerve blocks on June 17 and July 11.  During a follow up visit on August 11, 2008, Plaintiff reported doing badly after the last shot, with pain in the left forehead and right neck.  She also stated that pain medication did not help, and she requested antidepressants.  Dr. Sami noted that Plaintiff was smiling and sitting comfortably in her chair.  She had bouts of laughing and crying and was very concerned about not getting Effexor.  She appeared irritable with a flat affect.  Upon examination, Plaintiff's neck range of motion was complete in flexion/extension and lateral rotation.  Palpation revealed marked muscle spasm around the neck and generalized mild tenderness on both sides of her cervical spine.  Dr. Sami opined that Plaintiff's history and physical examination were consistent with failed cervical spine surgery, head and neck pain, and depression.  Dr. Sami noted that Plaintiff was scheduled for a psychiatric consultation on September 5, 2008.  He recommended that Plaintiff continue prescription medications, confer with her primary care doctor on starting Effexor, and return to the pain clinic in 3 to 4 weeks.  (Tr. 210-22)

On September 8, 2008, Plaintiff returned to Dr. Sami.  She saw Dr. Beitman for a psychological consult a few days before.  Palpation of the neck showed mild generalized tenderness in the neck and shoulders but no trigger or tender points.  Deep tendon reflexes were +2/5 in both upper extremities with no loss of sensation.  Motor strength was +5/5.  Dr. Sami assessed cervical fusions time 2 with complaints of head and neck pain.  He ordered an x-ray of the cervical spine and a CT scan. When Dr. Sami examined Plaintiff on September 22, 2008, he noted mild tenderness to

palpation in the lower cervical region with limited extension.  Dr. Sami noted that he had no further recommendation.  (Tr. 223-28)

On November 22, 2008, Plaintiff saw a nurse practitioner at Healthnet Regional Center and reported back strain and headaches. On December 6, 2008, Plaintiff stated that she was still experiencing pain in the neck and shoulder, which she described as tight and shooting pain.  In addition, Plaintiff stated that past occipital nerve blocks helped her headaches in the past.  She was considering having surgery.  The nurse practitioner educated Plaintiff on using a transcutaneous electrical nerve stimulation ("TENS") unit to assist with her pain. (Tr. 369-70)

Between November 2008 and June 2009, Lake sought treatment for her neck pain nine times at Healthnet and Missouri Baptist Hospital.  X-rays showed postoperative changes in the cervical spine, but the fusion and hardware fixation at the C5-C7 level was within expected limits. (Tr. 230-40)

Plaintiff saw Diane Mueller, APRN, at the Columbia Regional Hospital on July 6, 2009 for complaints of neck pain.  She also reported intermittent pain in her elbows radiating into her forearms, as well as headaches.  She rated the pain in her neck as 8 out of 10.  Raising her arms and moving her neck increased the pain.  While she did not have significant weakness in her hand grips, she expressed difficulty with fine motor tasks.  Physical examination revealed no acute distress, with full range of motion in her neck and no tenderness to palpation through her posterior cervical spine. The impression was neck pain with specific etiology unclear.  Nurse Mueller recommended cervical x-rays, CT scan, and MRI.  X-rays of the cervical spine revealed C2-C3 and C3-C4 borderline abnormal subluxation between extension and flexion.  A CT scan and MRI performed on July 27,

2009 revealed solid disc fusion in C5 to C7 with no high grade compression of the neural foramina or neural canal.  The tests did reveal some degenerative changes.  (Tr. 255-72)

On August 27, 2009, Thomas J. Spencer, Psy.D., performed a psychological evaluation and diagnosed Plaintiff with major depressive disorder, recurrent, moderate to severe; alcohol abuse and bipolar disorder by history; and a GAF score of 50-55.  Dr. Spencer opined that Plaintiff had a mental illness that continued to interfere with her ability to engage in employment.  (Tr. at 312-316)

Dr. Saleh Parvez saw Plaintiff on December 28, 2009 for complaints of depression, increased appetite, low motivation and energy, and trouble sleeping.  Dr. Parvez diagnosed severe major depressive disorder, severe and without psychosis.  He also increased Plaintiff's Elavil dosage and changed her Cymbalta to a morning dosage.  (Tr. 323-24)  Dr. Parvez saw Plaintiff again in March 2010 and May 2010 for continued depression. (Tr. at 468-69).

On January 22, 2010, Dr. Ahktar Choudhary, M.D., a neurologist at Rolla Neurology, examined Plaintiff for continued neck pain and headaches.  Plaintiff reported increasingly worse neck pain with pain radiating to her right arm.  She also reported numbness, tingling, and weakness in both arms with difficulty holdings things.  She rated the pain as an eight out of ten.  In addition, she experienced two headaches per week, which were severe.  On examination, Dr. Choudhary observed that Plaintiff's muscle tone was normal.  She had decreased strength in her grip and right upper extremities, but the rest of her muscles were normal.  Pin prick sensation was decreased in distribution of C6 on the right.  Dr. Choudhary also noted cervical radiculopathy, mild weakness in hand grip, rule out carpel tunnel syndrome.  Dr. Choudhary continued her current medication, added Topamax, and recommended nerve conduction studies.  (Tr. 333-34)

11

On February 23, 2010, Plaintiff underwent a nerve conduction study which was normal. Dr. Choudhary diagnosed her with cervical radiculopathy. (Tr. 329-32) Dr. Choudhary saw Plaintiff on March 23, April 20, and May 18, 2010 for neck pain and continued to diagnose her with cervical radiculopathy. (Tr. 328, 474-75)

Dr. Choudhary completed three opinion forms regarding Lake's functional capabilities in April 2010, including a Medical Source Statement – Physical, Medical Source Statement – Mental,  and a Migraine Questionnaire.  Dr. Choudhary opined that Plaintiff could lift and/or carry 10 pounds frequently and 20 pounds occasionally.  She could stand and/or walk for 1 hour continuously and 5 hours with usual breaks.  In addition, Plaintiff was able to sit for 2 hours continuously and sit for 6 hours with usual breaks.  Her ability to push and/or pull was limited in that heavy pushing and pulling could aggravate the neck pain.  Dr. Choudhary also opined that Plaintiff could occasionally climb, balance, stoop, reach, and handle.  Further, she needed to avoid some exposure to environmental factors.  Dr. Choudhary stated that Plaintiff needed to lie down every three to four hours for ten to fifteen minute breaks and noted that her pain medication could cause drowsiness and decreased concentration.  Additionally, Dr. Choudhary opined that Lake had moderate limitations in her ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to perform activities within a schedule, and ability to complete a normal workday and workweek without interruption from psychologically based symptoms.  Finally, Dr. Choudhary stated that while Plaintiff's migraines were mostly controlled by her medication, she experienced headaches one to two times per week, which lasted most of the day and prevented her from functioning if severe.  (Tr. at 336-342)

In February 2010, Dr. Gilbert Lang, completed his eighth report since April 2006 regarding Plaintiff's medical history and functional capacity.  The evaluations were in regard to a worker's compensation claim and based on history of the injury, physical examination, Plaintiff's complaints, and prior medical records.  Dr. Lang opined that Plaintiff's headaches were severe for about 2 hours twice a week and would further increase with significant flexion, extension, or heavy lifting.  He precluded the right upper extremity from heavy or repetitive above head work, heavy lifting, repetitive forceful grasping, prolonged work with small items, or prolonged keyboarding or writing. He also limited her left upper extremity from repetitive or heavy above head work, repetitive forceful grasping, and prolonged keying.  Dr. Lang noted positive objective findings with regard to Plaintiff's neck but not her headaches, and was limited in her ability to perform lifting, grasping, fine manipulation, prolonged writing and keyboarding, and overhead work. (Tr. 372-400, 401-466)

## IV.  The ALJ's Determination

In a decision dated July 13, 2010, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011.  She had not engaged in substantial gainful activity since June 5, 2009, her alleged date of onset.  Further, the ALJ determined that Plaintiff had the severe impairments of degenerative disc disease with chronic pain and depression, which was aggravated by chronic pain.  The ALJ assessed Plaintiff's medical and psychiatric records in making this determination.  In addition, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 12-18)

After considering the record, the ALJ determined that the Plaintiff had the RFC to perform somewhat less than the full range of light work.  Specifically, the ALJ found that Plaintiff could lift,

13

carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 hours in a usual work day with normal breaks; frequently push and pull with upper extremities; occasionally climb stairs, ramps, ladders, scaffolds, and ropes; occasionally reach overhead with both upper extremities; and understand, remember, and carry out simple instructions.  She needed to avoid concentrated exposure to cold and vibration.  The ALJ considered the medical statements from Dr. Choudhary in reaching this decision.  In addition, the ALJ noted that Plaintiff's reports of her symptoms were not supported by the medical evidence.  (Tr. 18-22)

The ALJ found that Plaintiff could not return to her past relevant work.  However, based on her younger age, high school diploma, work experience, and RFC, jobs existed in significant numbers in the national economy which Plaintiff could perform.  The ALJ relied on the VE's testimony to find Plaintiff could work as an office helper, office cleaner, and mail clerk.  The ALJ thus concluded that Plaintiff had not been under a disability as defined in the Social Security Act from June 5, 2009 through the date of the decision.  (Tr. 22-23)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination

of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI.  Discussion

In her Brief in Support of the Complaint, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to give controlling weight to Dr. Choudhary, Plaintiff's treating physician; failed to properly assess Plaintiff's RFC by not giving proper weight to the treating physician, not including limitations from non-severe impairments, and not evaluating Dr. Lang's opinion; and failing to conduct a proper credibility analysis.  The Defendant,

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

on the other hand, asserts that the ALJ properly evaluated Plaintiff's credibility in determining her RFC; properly considered the opinions of Plaintiff's treating physicians; and properly determined Plaintiff's RFC.  The undersigned finds that substantial evidence supports the ALJ's decision.

### A.  Opinion of the Treating Physician

Plaintiff first contends that the ALJ failed to give controlling weight to Dr. Choudhary, Plaintiff's treating physician.  Specifically, he argues that Dr. Choudhary's opinion regarding Plaintiff's limitations was consistent with treatment notes, the record as a whole, and Plaintiff's testimony such that the opinion was entitled to controlling weight.  Defendant asserts that the ALJ considered Dr. Choudhary's opinions and properly discounted those opinions that were inconsistent with the record.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).  However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted).  Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

Contrary to Plaintiff's position, the ALJ gave controlling weight to the majority of Dr. Choudhary's opinion regarding Plaintiff's limitations. For instance, the ALJ adopted Dr. Choudhary's lifting and carrying limitations, which were 10 pounds frequently and 20 pounds occasionally, with no heavy pushing or pulling.[2] (Tr. 19, 338) Further, the ALJ limited Plaintiff to occasionally climbing stairs, ramps, ladders, scaffolds, and ropes, as well as reaching over head. This essentially mirrors Dr. Choudhary's opinion. (Tr. 339) In addition, while the Plaintiff contends that the ALJ did not give substantial weight to Dr. Choudhary's limitations regarding sitting, standing/walking, and handling things. The record shows that the ALJ did consider these limitations and explicitly noted that none of Dr. Choudhary's treatment records or diagnostic testing demonstrated any impairment to Plaintiff's lower back or lower extremities. Plaintiff has failed to point to any objective medical evidence or diagnosis that supports any impairment to the low back or legs or handling. To the contrary, nerve conduction studies were normal, and Dr. Choudhary assessed only mild weakness in Plaintiff's muscle strength of hand grips and upper extremities. (Tr. 331, 334) As stated above, the ALJ may discount an inconsistent opinion where the treating physician has offered inconsistent opinions. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000) (stating an ALJ may discount or disregard a treating physician's opinion where the "treating physician renders inconsistent opinions that undermine the credibility of such opinions . . .") (citation omitted). In addition, the ALJ found that, consistent with Dr. Choudhary's limitation to sitting for 2 hours at a time, light work includes normal breaks every 2 hours. (Tr. 19) The ALJ also found that Plaintiff's

---

[2] The ALJ limited pushing and pulling to 10 pounds frequently and 20 pounds occasionally. (Tr. 19)

need for 10 to 15 minute breaks every 3 to 4 hours per Dr. Choudhary's opinion was consistent with normal breaks in work days.  (Tr. 20)

Plaintiff also argues that the ALJ erred in affording little weight to Dr. Choudhary's opinion regarding Plaintiff's mental limitations.  However, the ALJ correctly notes that Dr. Choudhary was not Plaintiff's mental health care provider.  Despite this fact, the ALJ did give some weight to Dr. Choudhary's opinion and limited Plaintiff to simple instructions and tasks.  (Tr. 20, 341)  The ALJ may give less weight to a treating physician rendering an opinion on an impairment the physician did not treat.  See 20 C.F.R. § 404.1527(c)(2)(ii) ("For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.").

Finally, with regard to headaches, while Dr. Choudhary stated that Plaintiff experienced headaches once or twice a week which lasted most of the day and could render her unable to function, he also stated they were mostly controlled by medication.  (Tr. 336)   An impairment that can be controlled by medication cannot be considered disabling.  Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (citation omitted).  Further, Plaintiff did not list headaches as a disabling limitation on her Disability Report, and she provided only cursory attention to headaches in her testimony.  (Tr. 49) Dr. Choudhary noted Plaintiff's complaints of headaches in his treatment records but did not order migraine testing or headache-specific treatment.  See Slack v. Astrue, No. 4:07CV1655 RWS, 2009 WL 723832, at *15 (E.D. Mo. March 17, 2009) (finding that conservative or minimal treatment militated against a disability finding) (citation omitted).  Thus, the undersigned finds that the ALJ properly assessed Dr. Choudhary's opinion in this case.

## B.  Plaintiff's RFC

Plaintiff next asserts that the ALJ erred in determining Plaintiff's RFC because he did not provide a narrative discussion describing how the evidence supported the RFC determination. Defendant maintains that the ALJ arrived at the decision by evaluating the entire record, discussing the medical evidence, and including only those limitations supported by the record.  The undersigned agrees with the Defendant.

The ALJ explicitly stated that Plaintiff could perform light work with further limitations, which he thoroughly discussed in a narrative opinion. (Tr. 19-22)  As stated above, the ALJ assessed Dr. Choudhary's opinion and gave that opinion proper weight.  With regard to Dr. Lang, the ALJ noted that the report appeared to be in response to litigation.  Further, much of the report relies on past medical history and Plaintiff's subjective complaints, as opposed to objective medical testing. The physical examination was mostly consistent with the ALJ's RFC finding.  For instance, Dr. Lang noted  no positive objective findings for Plaintiff's headaches.  (Tr. 396) Further, he precluded the right upper extremity from heavy or repetitive above head work, heavy lifting, repetitive forceful grasping, prolonged work with small items, or prolonged keyboarding or writing.  He also limited her left upper extremity from repetitive or heavy above head work, repetitive forceful grasping, and prolonged keying.  The RFC finding included lifting/carrying/pushing/pulling at only the light level and limited her to only occasional reaching overhead. (Tr. 19)  With regard to Plaintiff's allegations, and Dr. Lang's opinion, that Plaintiff was unable to handle objects, the ALJ properly discounted Dr. Lang's opinion, as the opinion was conclusory and unsupported by objective medical evidence.  See Swarnes, 2009 WL 454930, at *11 (citation omitted).

Review of the record demonstrates that the ALJ properly determined Plaintiff's RFC by providing a narrative discussion of the medical evidence and describing how the evidence supported the decision.  To the extent, that the ALJ discounted the opinions of Dr. Choudhary and Dr. Lang, the undersigned finds that those opinions were inconsistent with the evidence and conclusory.  See Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (upholding the ALJ's determination that the physician's opinions were not entitled to controlling weight because they were inconsistent with and unsupported by the medical record, including the doctor's own treatment notes).  Therefore, substantial evidence supports the ALJ's RFC determination.

### C.  Credibility Analysis

Last, the Plaintiff argues that the ALJ failed conduct a proper credibility analysis by disregarding Plaintiff's subjective complaints.  Defendant contends that the ALJ properly considered Plaintiff's testimony, the lack of objective medical evidence, medical reports pertaining to Plaintiff's restrictions, Plaintiff's treatment, and the effectiveness of the treatment in assessing Plaintiff's credibility.  The undersigned agrees with the Defendant.

The ALJ has the duty to make credibility findings. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (citation omitted).  In making a credibility determination, the ALJ must explain, based on the record as whole, why the plaintiff's claims are not credible. Id. (citations omitted).  Here, the ALJ considered Plaintiff's subjective reports regarding her symptoms and noted the degenerative disease in her neck which might cause radicular symptoms.  However, nerve conduction studies were normal.  In addition, Dr. Choudhary assessed only mild weakness in hand grip and right upper extremities.  Although the ALJ may not discount allegations of disabling pain

21

based solely on the lack of objective medical evidence, the lack of such evidence is a factor the ALJ

may consider.  Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (citation omitted).

 Further, the record shows that Plaintiff's daily activities are inconsistent with her allegations

of disabling pain.  Plaintiff reported that she was able to prepare meals, clean the house, watch TV,

drive, attend to personal care, shop, and socialize.  "Inconsistencies between subjective complaints

of pain and daily living patters diminish credibility."  Haley v. Massanari, 258 F.3d 742, 748 (8th Cir.

2001) (citation omitted).  In short, the ALJ considered all of the evidence in the record, including the

medical evidence and Plaintiff's subjective complaints, and found that, while the impairments could

cause some of the alleged symptoms, they did not limit Plaintiff to the extent alleged.[3]  Therefore, the

Court finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled

at any time from June 5, 2009, through the date of the decision.

 Accordingly,

 **IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social

security benefits be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and

Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  28th day of September, 2012.

---

 [3]  The undersigned notes that, while the ALJ mentions the regulations setting forth the
criteria for making credibility determinations, he does not specifically address each of the factors.
However, the record demonstrates that the ALJ applied the criteria to discount Plaintiff's
complaints of pain.  "'Although specific delineations of credibility findings are preferable, an
ALJ's arguable deficiency in opinion-writing technique doe not require [the court] to set aside a
finding that is supported by substantial evidence.'"  Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir.
1996) (quoting Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996)).